**\*NOT FOR PUBLICATION\***

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

_____
                              :

ALLSTATE NEW JERSEY          :
INSURANCE COMPANY a/s/o  :
KATHLEEN CANCEL,        :
                              :
                Plaintiff,   :     Civil Action No. 17-2738 (FLW) (LHG)
                              :
          v.                :
                              :       **OPINION**
AMAZON.COM, INC.,          :
                              :
                              :
                Defendant.  :
_____ :

**WOLFSON, United States District Judge**:

       Presently before the Court are a Motion for Partial Summary Judgment filed by Plaintiff, subrogee, Allstate New Jersey Insurance Company ("Plaintiff" or "Allstate") and a Cross-Motion for Summary Judgment filed by Defendant Amazon.com, Inc. ("Defendant" or "Amazon"). The current dispute stems from an allegedly defective laptop battery that Plaintiff's insured purchased from a third-party seller through Amazon. Plaintiff brings a products liability claim under the New Jersey Products Liability Act ("PLA"), alleging that Defendant, in its role as a "product seller," as it is defined by the PLA, is strictly liable for damage resulting from a fire created by the defective battery. Both parties move for summary judgment on two questions: 1) whether Amazon meets the definition of "product seller" subject to liability under the PLA; and 2) whether Section 203 of the Communications Decency Act ("CDA") nonetheless immunizes Defendant from liability.

For the reasons that follow, based on the particular facts of this case, the Court finds that Amazon's actions do not qualify it as a "product seller." Because Amazon is not a "product seller," the Court need not reach the CDA's immunity provision. Accordingly, Defendant's Motion for Summary Judgment is granted, and Plaintiff's Motion for Partial Summary Judgment is denied.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Allstate is an Illinois Corporation and the subrogee of its insured, Kathleen Cancel. Compl. at ¶ 1. Amazon is an internet-based marketplace for the sale of products, with net sales in 2016 of $135,987,000,000.00. Plaintiff's Local Civil Rule 56.1 Statement of Material Facts Not in Dispute ("PSOF"), ¶¶ 1–2.[1] Amazon describes itself as "operate[ing] an online marketplace at www.amazon.com, which is a service that Amazon provides for sellers to offer products and buyers to purchase them," and states that it offers an "information service and system designed so that multiple users across the world can access the servers and browse the marketplace at the same time." Defendant's Local Civil Rule 56.1 Statement of Material Facts Not in Dispute ("DSOF"), ¶¶ 1–2.

Kathleen Cancel lived in a home located in Farmingdale, New Jersey with her two daughters, Megan and Kalie Wilmot. PSOF at ¶ 24. Kalie Wilmot (hereinafter, "Ms. Wilmot") owned a Hewlett Packard Pavilion laptop computer, and on July 31, 2016, using her mother's Amazon Prime account, purchased a replacement battery for her laptop after conducting a search for the battery on Amazon's website. *Id.* at ¶¶ 27–28. Ms. Wilmot purchased the battery from Amazon because she believed the company to have good deals, and because the battery was

---

[1] For the sake of brevity, all citations to the parties' Rule 56.1 statements in this Opinion incorporate the evidentiary citations contained therein.

available through Amazon Prime with free shipping. *Id.* at ¶ 30. The "sold by" line next to the battery's price and shipping information on the Amazon order page identified "E-life" as the seller of the product. DSOF at ¶ 16. E-Life was again identified on the order confirmation page before the user clicks the "place your order" button. *Id.* Ms. Wilmot, nonetheless, was under the impression that Amazon was the battery seller.[2] PSOF at ¶ 35. Amazon charged Ms. Wilmot's credit card $12.29 for the battery and the Amazon name appeared on her credit card statement. *Id.* at ¶ 29. Amazon shipped the battery to Ms. Wilmot from its Virginia fulfillment center in an Amazon box sealed with Amazon tape. *Id.* at ¶¶ 32–33.

Ms. Wilmot returned home from school on September 9, 2016, at approximately 3:00 p.m., and began using her laptop with the replacement battery. *Id.* at ¶ 40; Defendant's Responsive Statement of Material Facts ("DRSOF") at ¶ 40. When she left for work at approximately 5:00 p.m., Ms. Wilmot left the laptop on her bed with the battery charging. PSOF at ¶ 40. When Megan Wilmot returned to the home at approximately 7:00 p.m., she opened the front door to find the smoke detector going off and smoke coming from the house. Megan entered the house, opened her sister's bedroom door, and saw her bed on fire. She rescued her dog (but not her cats), evacuated, called 911, and watched the house burn. *Id.* at ¶ 41. After the fire at issue, the Amazon Product Safety Department sent Ms. Wilmot an email advising her of a potential fire hazard with the laptop battery. *Id.* at ¶ 37. Amazon processed a refund for Ms. Wilmot in the form of a gift card and advised her to dispose of "the defective battery." *Id.* at ¶ 38.

---

[2] Defendant disputes this fact, asserting that "Ms. Wilmot testified that she really had no idea who the seller of the battery was." DRSOF at ¶ 34. But, while Ms. Wilmot testified that she did not know who manufactured the product, with regard to the sale, she testified, "I consider it to be, like, more of Amazon because I'm going on Amazon.com to buy that battery." Declaration of Beth S. Rose, Exhibit A (K. Wilmot Deposition Transcript 163:23-165:18).

Although the battery that Ms. Wilmot purchased was sold under the "E-Life" name, the seller is also known as Lenoge Technology (HK) Limited ("Lenoge").[3] *Id.* at ¶ 44. Lenoge is located in Hong Kong and sells products on Amazon.com using the "E-Life" name. *Id.* at ¶ 46. Neither Plaintiff nor Defendant is aware who manufactured the laptop battery that Ms. Wilmot purchased. *Id.* at ¶¶ 36, 39. On December 4, 2012, Lenoge entered into the Amazon Services Business Solutions Agreement ("ABSA"), as required by Amazon. *Id.* at ¶ 3. The ABSA grants Amazon a "royalty-free . . . license to use, . . . adapt, modify, reformat, create derivative works of, and otherwise . . . exploit in any manner, any and all of [a third-party sellers's] Materials . . . ," including a third-party seller's product information, data and materials. *Id.* at ¶ 4. The ABSA also requires sellers to provide "accurate and complete Required Product Information," and to "promptly update such information as necessary to ensure it at all times remains accurate and complete" *Id.* ¶¶ 8–9; ECF No. 13-6 (the ABSA) at 9. The sellers' listings are subject to the requirement that they "comply with all applicable Laws (including all minimum age, marking and labeling requirements) and do not contain any sexually explicit…, defamatory or obscene materials." ABSA at 9. The ABSA requires pricing parity with third-party sellers' other sales channels, mandating that pricing be "at least as favorable to Amazon users as the most favorable terms upon which the product is offered and/or sold" through other channels. PSOF at ¶10. The ABSA also mandates that third-party sellers who use Amazon's Fulfillment by Amazon ("FBA") service provide goods that are suitable for sale and, further, authorizes Amazon to return or discard products that create "a safety, health or liability risk to Amazon, its personnel or any third party." PSOF at ¶ 11.

---

[3] Hereinafter, the Court will use "Lenoge" and "E-Life" interchangeably.

Amazon customers cannot make direct payment to third-party sellers. Payments must be processed through the Amazon.com site. *Id.* at ¶ 15. Amazon provides payment processing for transactions on the marketplace. DSOF at ¶ 14. It charges the payment instrument designated in the buyer's account, and remits the purchase price to the third-party seller minus the service fees the seller agreed to in the BSA. *Id.* Amazon charges sellers who enroll in its FBA program, among other things, a "Referral Fee," based on the price of a product "for the advantages of selling their products on Amazon.com." PSOF at ¶ 16. Amazon uses part of the Referral Fee to pay for "marketing activity to bring customers to [Amazon]." *Id.* Amazon's "Referral Fee" includes a "Sales Referral Fee," a "Per Sale Closing Fee," and a payment processing fee—a fee that Amazon also calls a "Variable Closing Fee." *Id.* at ¶ 16.

Defendant guarantees products purchased on its website, including the battery that Ms. Wilmot purchased, through its "A-to-Z Guarantee." *Id.* at ¶ 12. The Guarantee states:

> We want you to buy with confidence anytime you make a purchase on the Amazon.com website . . . ; that's why we guarantee purchases from third-party sellers when payment is made via the Amazon.com website . . . The condition of the item you buy and its timely delivery are guaranteed under the Amazon A-to-z Guarantee.

*Id.* The Guarantee protects Amazon customers from defective products, allowing users to file a claim if, among other things, "[t]he item [the user] received was damaged, defective . . . or you changed your mind . . . ." *Id.* at ¶ 13. The A-to-Z Guarantee, however, is not a warranty and carries several restrictions, and guarantees only that Amazon will provide the buyer a refund of the sale price, upon certain conditions being met. DRSOF at ¶ 12.

In addition to the A-to-Z Guarantee, users also assent to the "Conditions of Use" when establishing their Amazon accounts, and again when placing an order, which, according to Defendant, apply to all transactions. DSOF at ¶¶ 4–5. The "Conditions of Use" state that

> Parties other than Amazon operate stores, provide services, or sell product lines through the Amazon Services. * * * We are not responsible for examining or evaluating, and we do not warrant the offerings of, any of these businesses or individuals or the content of their Web sites. Amazon does not assume any responsibility or liability for the actions, product, and content of all these and any other third parties.

*Id.* at ¶ 6. Allstate disputes that the current "Conditions of Use" apply to the purchase made by Ms. Wilmot, who used her mother's Amazon Prime account to purchase the allegedly defective battery. PRSOF at ¶ 4.

Lenoge had participated in the FBA program, which allows third-party sellers to send their product inventory to Amazon.com fulfillment centers. PSOF at ¶ 18. For these services, Amazon charges FBA sellers an "FBA Order Handling Fee," an "FBA Pick & Pack Fee," and an "FBA Weight Handling Fee." *Id.* These logistical service fees are separate from, and in addition to, the sales Referral Fee Amazon charges to sellers. *Id.* The products are fully assembled and packaged before the third-party sellers send them to the fulfillment centers for storage. DSOF at ¶ 25. The third-party sellers retain title to their products and pay for storage space. *Id.* at ¶ 26. Lenoge sent the laptop battery to an Amazon fulfillment center in Virginia, where it was stored until sale. PSOF at ¶ 48. When Ms. Wilmot purchased the battery, an Amazon employee retrieved the product from a shelf, boxed the product, applied a shipping label to the box, and transferred the package to a third-party carrier for shipment. *Id.* For this particular purchase, Amazon charged Lenoge fees totaling $4.86 on the $12.29 battery purchase price—a $1.00 FBA order handling fee, a $1.06 FBA Pick & Pack fee, a $0.96 FBA Weight Handling Fee, and a $1.84 Referral Fee. *Id.* ¶ 49.

Defendant also provides customer service for products purchased through the FBA program. *Id.* at ¶ 20. According to Defendant, this customer service is limited to delivery-related questions, but the third-party seller remains responsible for product-related customer service.

DSOF at ¶ 28. When it provides customer service, Defendant allows consumers to interact directly with Amazon customer service agents. PSOF at ¶ 20. Had Ms. Wilmot opted to return the battery to Amazon, she would have navigated to the return section of the site, generated an Amazon return shipping label, and mailed the battery to the designated Amazon facility for a credit on her credit card. *Id.* at ¶ 36.

Amazon does not require third-party sellers to identify product manufacturers. *Id.* at ¶ 22. Although the parties dispute whether Defendant requires foreign vendors to implement means for United States service of process, the record does not reflect that Lenoge, a Hong Kong based company, was subject to process in this country. *Id.* at ¶ 21; DRSOF at ¶ 21. Section 6 of the ABSA requires sellers to indemnify Amazon for any claims or losses arising from or related to the sale of its products, stating:

> You release us and agree to indemnify, defend and hold [us] harmless
> . . . against any claim, loss, damage . . . or other liability . . . arising
> from or related to . . . Your Products . . . and any . . . property damage
> related thereto . . . .

PSOF at ¶ 5. The ABSA also requires sellers to maintain liability insurance naming Amazon as an insured upon reaching an "Insurance Threshold." *Id.* at ¶ 6. The parties dispute whether Defendant takes proactive steps to determine whether vendors satisfy the insurance threshold and procure the mandated coverage. *Id.* at ¶ 7; DRSOF at ¶7.

On March 8, 2017, Plaintiff filed this civil action in the New Jersey Superior Court, Monmouth County, Law Division. ECF No. 1 at ¶ 1. Plaintiff brought one products liability count under the PLA, alleging that Defendant, a "product seller" as defined by the PLA, "marketed sold, shipped, assembled, packaged, distributed and/or was otherwise involved in placing the defective battery in the stream of commerce," shipped a battery that "was not reasonably fit, suitable, or safe for its intended purpose," and "had a duty to warn Cancel that the

battery was in an unreasonably dangerous condition." Compl., at ¶¶ 32–34. On April 21, 2017, Defendant removed the case to this Court on the basis of diversity jurisdiction because, (i) Plaintiff is organized under the laws of Illinois with its principal place of business in Northbrook, Illinois; (ii) Amazon is a corporation organized under the laws of Delaware, with its principal place of business in Seattle, Washington; and (iii) the property damage the fire allegedly caused exceeds $75,000 in value. Compl., at ¶ 2. After discovery ensued, Plaintiff filed the instant motion for Partial Summary Judgment on December 12, 2017, and Defendant filed its Cross-Motion for Summary Judgment on January 22, 2018.

## II.     LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (citation omitted).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322. If the movant satisfies its initial burden, the nonmoving party cannot rest upon mere allegations in the pleadings to withstand summary judgment; rather, the nonmoving party "must counter with specific facts which demonstrate that there exists a genuine issue for trial." *Orson*, 79 F.3d at 1366. Specifically, the nonmoving party "must make a showing sufficient to establish the existence of each element of his case on which he will bear the burden of proof at trial." *Huang v. BP Amoco Corp*, 271 F.3d 560, 564 (3d Cir. 2001); *see Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995) ("[A] plaintiff cannot resist a properly supported motion for summary judgment merely by restating the allegations of his complaint, but must point to concrete evidence in the record that supports each and every essential element of his case."). Thus, "a mere 'scintilla of evidence' in the nonmovant's favor" is insufficient to create a genuine issue of fact." *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 666 (3d Cir. 2016) (citation omitted); *see Lackey v. Heart of Lancaster Reg'l Med. Ctr.*, 704 F. App'x 41, 45 (3d Cir. 2017) ("There is a genuine dispute of material fact if the evidence is sufficient for a reasonable factfinder to return a verdict for the nonmoving party."). Ultimately, it is not the Court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return a verdict for the nonmoving party. *See Brooks v. Kyler*, 204 F.3d 102, 105 n. 5 (3d Cir. 2000).

## III. <u>DISCUSSION</u>

This Court is called upon to answer the question of whether Amazon's involvement in the sale of the battery qualifies it as a "product seller" for purposes of the PLA. In its normal course of business, Amazon is generally involved in three types of transactions: 1) the direct sale of its own Amazon-branded products to consumers, 2) the sale of a product directly from a vendor to a

consumer, with Amazon merely allowing the vendor to advertise the product and the consumer to order it, and 3) the sale of a product from a vendor to a consumer, with Amazon fulfilling the transaction by holding the product in its inventory and shipping it to the consumer. While Amazon almost certainly would be a "product seller" for its role in the first transaction, and likely would not be a "product seller" for its role in the second transaction, the transaction in the present case falls into the third, grayest, category.

Plaintiff asks the Court to reach new ground to expand the definition of "product seller" to cover Amazon's activities in fulfilling the order between Ms. Wilmot and E-Life. Plaintiff mainly argues 1) that under New Jersey law, someone within the distribution chain is a "product seller," and Amazon, a party within the distribution chain, is thus a "product seller"; and 2) public policy supports holding Amazon liable as a "product seller." Although it is a close question, Plaintiff's arguments fail because it has not demonstrated that New Jersey courts would, in fact, extend the definition of "product seller" to a party involved in the distribution chain as Amazon was here. Public policy arguments likewise do not establish that a New Jersey strict liability law is meant to capture Amazon's actions under the extant facts. Thus, for the reasons that follow, Amazon—in this instance—cannot be held liable as a "product seller" under the PLA.

### A. The New Jersey Products Liability Act

In order to determine whether Amazon qualifies as product seller under the PLA, this Court, sitting in diversity, must predict how the New Jersey Supreme Court would decide an issue that has not been resolved by the Supreme Court. *See Ill. Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 231 (3d Cir. 2011). Moreover, although state intermediate appellate decisions are not controlling, the U.S. Supreme Court, in *West v. A.T. & T.*

*Co.*, 311 U.S. 223, 237 (1940), has advised that "an intermediate appellate state court ... is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.*; *see Edwards v. HOVENSA, LLC*, 497 F.3d 355, 361 (3rd Cir. 2007).

By way of background, under New Jersey law, "Product liability actions…are governed by [the] Products Liability Act (PLA), N.J.S.A. 2A:58C-1 to-11." *Banner v. Hoffmann-La Roche Inc.,* 383 N.J.Super. 364, 375 (App. Div. 2006), *certif. denied*, 190 N.J. 393 (2007). The PLA was enacted by the New Jersey Legislature in 1987 "based on an 'urgent need for remedial legislation to establish clear rules with respect to certain matters relating to actions for damages for harm caused by products.'" *Sinclair v. Merck & Co*., Inc., 195 N.J. 51, 62 (2008) (citing N.J.S.A. § 2A:58C−1(a)). As the New Jersey Supreme Court has explained, by enacting the PLA "'[t]he Legislature intended…to limit the liability of manufacturers so as to 'balance[ ] the interests of the public and the individual with a view towards economic reality.'" *Sinclair*, 948 A.2d at 593 (quoting *Zaza v. Marquess & Nell, Inc.*, 144 N.J. 34, 675 A.2d 620, 627 (1996)). The Act has been interpreted as evincing a legislative policy "to limit the expansion of products-liability law." *Zaza*., 144 N.J. at 47 (citing *Roberts v. Rich Foods, Inc*., 139 N.J. 365, 374 (1995)).

The PLA limits liability to manufacturers and "product sellers," and states, in pertinent part:

> A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable[,] or safe for its intended purpose because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner.

N.J.S.A. 2A:58C–2. In 1995, the New Jersey State Legislature amended the PLA, enacting

N.J.S.A. 2A:58C–8 to –9, which separately defines manufacturer and "product seller." *See*

*Claypotch v. Heller, Inc*., 360 N.J. Super. 472, 483 (App. Div. 2003). It defines a "product

seller" as

> "any person who, in the course of a business conducted for that purpose: sells;
> distributes; leases; installs; prepares or assembles a manufacturer's product
> according to the manufacturer's plan, intention, design, specifications or
> formulations; blends; packages; labels; markets; repairs; maintains or otherwise is
> involved in placing a product in the line of commerce." N.J.S.A. § 2A:58C-8.

Although product sellers are subject to liability under the PLA, the 1995 amendments

include an immunity provision "to rescue persons it categorized as 'product sellers' from strict

liability in certain circumstances." *Thomas v. Ford Motor Co*., 70 F. Supp. 2d 521, 530 (D.N.J.

1999).  Thus, "by filing an affidavit correctly identifying the manufacturer of the product," a

defendant seller can escape liability under the act. *Claypotch*, 360 N.J.Super. at 483 (citing

N.J.S.A. 2A:58C-9(b)). Even when a product seller submits the affidavit certifying the correct

identity of the manufacturer, a product seller may still be liable if the seller "exercised some

significant control over the design, manufacture, packaging or labeling of the product relative to

the alleged defect in the product which caused the injury, death or damage [; or]…if [t]he

manufacturer has no known agents, facility, or other presence within the United States[;] or [t]he

manufacturer has no attachable assets or has been adjudicated bankrupt and a judgment is not

otherwise recoverable from the assets of the bankruptcy estate." *Claypotch*, 823 A.2d at 852

(citing § 2A:58C–9(c)(2), (3), (d)(1)). Moreover, a product seller also may be subject to liability

"if it 'knew or should have known of the defect in the product which caused the injury, death or

damage or the plaintiff can affirmatively demonstrate that the product seller was in possession of

facts from which a reasonable person would conclude that the product seller had or should have had knowledge of the alleged defect in the product which caused the injury, death or damage; or …created the defect in the product which caused the injury, death or damage.'" *Id.* (citing § 2A:58C–9(d)(2), (3)). Therefore, "a product seller is relieved from liability only if it is 'truly innocent of responsibility for the alleged product *and* the injured party must retain a viable claim against the manufacturer.'" *Bashir v. Home Depot*, No. 08–04745, 2011 WL 3625707, at *3 (D.N.J. Aug. 16, 2011) (emphasis added).

### B. Amazon Is Not a "Product Seller" Under the PLA

The parties dispute whether Amazon's actions in this case qualify it as a "product seller" under the PLA. By the PLA's broad language, "any party involved in placing a product in the line of commerce" can meet the definition of a "product seller." This language is consistent with the principles of New Jersey strict products liability law, which hold that, generally, a consumer injured by a defective product may bring a strict liability action against any business entity in the chain of distribution. *See, e.g.*, *Mettinger v. Globe Slicing Mach. Co.*, 153 N.J. 371, 380 (1998); *Michalko v. Cooke Color & Chem. Co.*, 91 N.J. 386, 394 (1982); *American White Cross Laboratories, Inc. v. Continental Ins*. Co., 202 N.J.Super. 372, 379 (App. Div.1985); *Santiago v. E.W. Bliss Div*., 201 N.J.Super. 205, 223 (App. Div.1985). In that regard, although a distributor and a retailer may be innocent conduits in the sale of the defective product, they remain liable to the injured party. *American White Cross*, 202 N.J.Super. at 379; *Santiago*, 201 N.J.Super. at 223. Thus, an entity can be within the chain of distribution even without taking possession of the product. *Promaulayko v. Johns Manville Sales Corp.*, 116 N.J. 505, 510–11 (1989). The absence of the original manufacturer or producer does not deprive the injured party of a cause of action. *Id.*

Despite the PLA's broad language and the state courts' expansive interpretation of strict products liability law, the reach of the PLA is not boundless. Indeed, not every party involved in the distribution process can be classified as a "product seller." Under state law, control over the product is the touchstone that New Jersey courts have considered to determine whether a party has the requisite involvement to be a product seller. *See Lyons v. Premo Pharmaceutical Labs, Inc.*, 170 N.J.Super. 183, 196 (App.Div.), *certif. denied*, 82 N.J. 267 (1979). Thus, even when there is "no doubt" that a party is "in the chain of distribution and contributed to placing the product in the stream of commerce," it, nonetheless, "must be shown that [the party] exercised control over the product." *Id.* (citing *Scanlon v. General Motors Corp.*, 65 N.J. 582, 590 (1974)). The focus is on a party's control of the product itself—that is, the ability to exercise dominance over, for example, the manner in which the product is sold.

Consistent with this principle, New Jersey courts, in cases involving intermediaries in the distribution process, look to whether the intermediary's role "was that of a facilitator rather than an 'active participant' in the transaction," focusing particularly on whether it "[ever] had physical control of the product [or] had merely arranged the sale." *Laidlow v. Hariton Mach. Co.*, 335 N.J. Super. 330, 345 (App. Div. 2000), *rev'd on other grounds*, 170 N.J. 602, 790 A.2d 884 (2002). In *Lyons*, for example, a broker between the manufacturer of a bulk drug and the manufacturer of the drug in final packaged form, although a facilitator in the chain of distribution of the drug, was not strictly liable in tort for damages caused by the drug because the broker, who had no control over the drug whether by manufacture, packing or marketing, was not an active participant in its chain of distribution. *Lyons*, 170 N.J.Super. at 196–97. Had the broker had "any active role in [the buyer's] decision either to purchase DES or to package it for pregnant women," then liability might have been appropriate. *Id.*; s*ee also Oscar Mayer Corp. v.*

*Mincing Trading Corp.*, 744 F.Supp. 79 (D.N.J.1990) (holding that strict liability is not available against a broker who does not exercise any degree of control over a defective product). In contrast, when a broker does exercise some degree of control, such as by taking title to the product, courts have reached a different result. *See Straley v. United States*, 887 F.Supp. 728 (D.N.J.1995); *Agurto v. Guhr*, 381 N.J. Super. 519, 526 (App. Div. 2005) (finding that "[s]trict liability may also apply to a broker who takes possession of goods, or exercises control over them, and then transfers them to a buyer").

Here, as in the broker cases, Amazon may have technically been a part of the chain of distribution, but it never exercised control over the product sufficient to make it a "product seller" under the PLA. In fact, the agreements governing the relationship between the parties make clear the limits of Amazon's control over the product at issue. Under the ABSA, it is the third-party seller that decides what to sell, sources the product from the manufacturer or upstream distributor, and ensures the product is properly packaged and complies with all applicable laws. Amazon's initial involvement in the sales process is allowing the seller to post a product listing on its website. But, even in this role, the ABSA states that the third-party seller— not Amazon—must provide the content for the product listing page in the form of "accurate and complete Required Product Information for each product or service that [it] makes available to be listed for sale through the Amazon Site," and must also "promptly update such information as necessary to ensure it at all times remains accurate and complete." ABSA at 8. Amazon's control over the content of the page is limited to ensuring that it fits within the website's format and that the listing contains all the material "required by applicable Law to be displayed in connection

with the offer, merchandising, advertising or sale of Your product."[4] Defendant also did not control the price of the product, as Plaintiff contends, because the ABSA mandates that sellers set their own prices, constrained only by the prices they set in other channels. Thus, according to the terms of the agreement, a buyer who purchases an E-Life product on Amazon is engaging in a transaction with the seller that Amazon is merely facilitating, and the agreement does not provide Amazon the ability to modify the product or exercise control over the online listing.

Even Amazon's storage and shipping services (the FBA program) did not grant Defendant any control over the product. Amazon took possession of the battery at issue here in accordance with the FBA program, and held it in an Amazon.com fulfillment center in Virginia before Ms. Wilmot placed her order. Then, when Ms. Wilmot purchased the battery, an Amazon employee retrieved the product from a shelf, boxed the product, sealed the box with Amazon shipping tape, applied a shipping label to the box, and transferred the package to a third-party carrier for shipment. Amazon's only role through this process was locating, boxing, and shipping an already packaged and assembled product. Nothing in the FBA program contradicts the ABSA provision that it is the *seller's* responsibility to source the product and provide it to Amazon properly packaged; nor does any provision of the FBA agreement grant Amazon a right to in any way alter the product other than hold it in its inventory, and eventually, ship it to the buyer. There are *some* restrictions on what Amazon can do with the product—i.e. it cannot sell "excluded products," like guns; but nothing gives Amazon the requisite level of control over the item to make it a product seller under the PLA.

---

[4] The ABSA also gives Amazon a license to use and exploit E-Life's intellectual property, product information, data and materials, but this does not give Amazon control over the product itself.

While Amazon never held title to the product, New Jersey courts "have clearly rejected the requirement that a technical sale occur before strict liability will be imposed." *Michalko v. Cooke Color & Chem. Corp.*, 91 N.J. 386, 401 (1982) (citing *Cintrone v. Hertz Truck Leasing & Rental Service*, 45 N.J. 434, 452 (1965)); *see also Weber v. Johns-Manville Corp.*, 630 F.Supp. 285, 289 (D.N.J. 1986) (recognizing that, rather than impose an "absolute 'hands on' requirement" to establish control, New Jersey courts employ a "stream of commerce" rationale to find liability). Nonetheless, the question of whether an intermediate distributor took title to the product can be relevant in determining the necessary control that the distributor exercised.

For example, in *Oscar Mayer* the court analyzed whether a broker between an importer of whole black peppercorns and a supplier of recleaned and treated peppercorns was in the chain of distribution. *Oscar Mayer*, 744 F.Supp. at 84. In finding that the broker could not be held strictly liable, the court noted that the broker "never had title to, possession of, or control over the lot of peppercorns." *Id.* The issue of holding title was relevant in determining that the broker was "not in a position to eliminate defects from the peppercorn," making it "unfair to impose strict liability on [the broker] for damages incurred as a result of the defective peppercorns." *Id.* But again, courts have made clear that holding title is merely a metric that a court can use to evaluate whether party has control over a product.

The court in *Laidlow v. Hariton Machinery Co., Inc.* emphasized this point in determining that a broker who *did* take title to a rolling mill was not a "product seller" under the PLA. 335 N.J. Super. 330, 347 (App. Div. 2000). There, the court found that the defendant took title as "merely a business accommodation rather than a requisite affirmative act placing the mill in the line of commerce so as to justify the imposition of strict liability." *Id.* The defendant "located a mill which was then inspected by [the buyer]," but "never took possession of the mill,

never altered its characteristics, and, without dispute, simply acted as a broker." *Id.* Thus, although taking title might sometimes "be a factor in determining whether a broker has entered the chain of distribution," that issue alone was not dispositive because the defendant never exercised the requisite control. *Id.* Here, then, Amazon's lack of title to the battery at issue indicates that it had little independent discretion about whether to sell or alter the product. These decisions remained with the actual title holder, E-Life, throughout the sales process. Without even this basic control over products within its possession, Amazon is not a "product seller" here.[5]

In addition to arguing that the broker cases are distinguishable because of their purported focus on holding title, Plaintiff contends that Amazon exerted more control over the transaction than the sellers did in those cases. For instance, Plaintiff contends that "the *Laidlow* court based its decision, in part, on its finding that there was no showing that the machine broker exercised significant control over the product or knew or should have known of the defect," and that "[u]nlike the broker in *Lyons*, Amazon's activities establish that, with respect to the distribution chain for the battery, Amazon was an active participant."[6] ECF No. 21 at 9–10. Yet even if Plaintiff is correct that Amazon exerted more control over the product than the brokers in those

_____

[5] Plaintiff's attempt to distinguish *Smith v. Alza Corp.* is also inapt. 400 N.J. Super. 529, 541 (App. Div. 2008). There, the Court determined that the labeler and packager of a diet drug was not a "product seller" for the purposes of the PLA's immunity provision, but rather more akin to a manufacturer. Plaintiff claims that the case is distinguishable because, here, the Court need only to consider whether Amazon is a "product seller," not whether it is either a "product seller" or a manufacturer. That distinction is irrelevant because the court in *Smith* did not obfuscate the issue, and clearly determined that the defendant was not a "product seller," in part because it never "obtain[ed] title to the product throughout the entire manufacturing or distribution process so as to be considered a seller who exchanged ownership or passed title to the product in issue." *Id.* at 541–42.

[6] Plaintiff also argues that *Oscar Mayer* is distinguishable because the question there "was whether the defendant, an actual broker, who never had possession or control of the spice at issue, had a duty to discover latent defects." ECF No. 21 at 8. Plaintiff misreads the cases. The court

cases, it has not presented any authority holding that the level of control that Amazon exerted

brings it within the bounds of strict liability.

Indeed, the cases on which Plaintiff relies to argue that Amazon is a product seller are not

directly applicable to the current dispute. *Promylauko*, a case that Plaintiff cites extensively for

the proposition that any party in the distribution chain can be held strictly liable, addressed the

question of whether fellow distributors could seek indemnity from each other, but did not focus

on why the two parties would be liable to the plaintiff and, importantly, did not discuss in detail

the distributors' degree of control over the product. 116 N.J. at 511–12. *Weber v. Johns-*

*Manville Corp*, which Plaintiff cites for the proposition that a purported broker need not have

physical possession of a product to be a "product seller," arose in the unique context of asbestos

distribution, and is not on point. 630 F. Supp. At 286. There, the court found that the asbestos

distributor was not "an ordinary broker" because it was "intimately involved in the asbestos

industry for a number of years as contractor, distributor, and fabricator" and had "familiarity

with the hazards and norms of the industry." *Id.* at 288. The sale of an everyday computer

battery, however, is not analogous to the sale of a product that poses the type of dangers that

asbestos does, and Amazon is not uniquely positioned to diagnose the risks posed by the sale.

Thus, the considerations that led the court in *Weber* to hold liable an experienced asbestos

distributor that did not take possession of the product do not apply equally here.

Although not controlling on this Court, courts in other jurisdictions have recently found

that Amazon is not in the class of actors subject to strict liability under state product liability

---

discussed defendant's duty to discover while dealing with plaintiff's *negligence* claim. It was in
dismissing the plaintiff's *strict liability* claim—the claim at issue here—that the court noted that the
broker never "had title to, possession of, or control over the lot of peppercorns." *Oscar Mayer*, 744 F.
Supp. at 84.

statutes, some of which are similar to the PLA. *See Fox v. Amazon.com, Inc.*, No. 3:16-CV-03013, 2018 WL 2431628, at *6 (M.D. Tenn. May 30, 2018) (finding Amazon not to be a "seller" under the Tennessee Products Liability Act, Tenn. Code Ann. § 29–28–102(7)); *Erie Ins. Co. v. Amazon.com Inc.*, No. CV 16-02679-RWT, 2018 WL 3046243, at *3 (D. Md. Jan. 22, 2018) (finding that Amazon was not a seller under Maryland's UCC); *Oberdorf v. Amazon.com, Inc.*, 295 F. Supp. 3d 496, 499 (M.D. Pa. 2017) (finding Amazon to not be a "seller" under Pennsylvania Strict Products Liability Law); *Milo & Gabby LLC v. Amazon.com, Inc*., 693 Fed. Appx. 879 (Fed. Cir. 2017) (finding that Amazon did not meet the definition of seller under 17 U.S.C. § 106(3) of the Copyright Act); *McDonald v. LG Elecs. USA, Inc.*, 219 F. Supp. 3d 533, 542 (D. Md. 2016) (finding that Amazon's role as the "platform" for the third-party sales does not qualify it as a merchant or a seller under Maryland's UCC); *Stiner v. Amazon.com, Inc.*, No. 15-185837 (Loraine Cnty. Ct., Ohio Sept. 20, 2017) (finding Amazon is not a "supplier" under Ohio's products liability law).

These cases do not forecast how the New Jersey Supreme Court would rule on the issue, but they are, nonetheless, instructive. In *Milo & Gabby*, for instance, the court dealt with whether Amazon was a "seller" for the purposes of determining whether the company could be held liable for copyright infringement under 17 U.S.C. § 106(3) of the Copyright Act. Notwithstanding the differing statutes, *Milo & Gabby* also involved a third-party seller that used Amazon's FBA service to sell a product to a buyer. In determining that Amazon was not a seller, the court wrote,

> Amazon, moreover, did not control what information or pictures were put on the product-detail page, nor did it control the price for which the product was sold. FAC System, or other third-party sellers as applicable to their products, controlled these details at all times. Amazon, therefore, was not responsible for the actual listing of the product for sale, consummating the sale, or transferring title. Instead, Amazon merely provided an online marketplace that third-party sellers could use

to sell their products and then, in some instances when the third-party sellers used the additional Amazon services, shipped the products to the final destination.

*Milo & Gabby*, 693 F. App'x at 886–87 (internal citations omitted). The factual scenarios between this case and *Milo & Gabby* are substantially similar: the third-party seller shipped the product to Amazon's warehouse, controlled the content for the product listing, dictated the price, and, ultimately, transferred title to the buyer. Throughout this process, Amazon, although in possession of the product, lacked the necessary control over the product. Thus, in both instances, "while Amazon's services made it easier for third parties to consummate a sale, the third parties remained the sellers." *Id.* at 887; *See also Fox*, 2018 WL 2431628 at *7 (noting that "even if it were shown Amazon provided storage and shipping services here, the evidence indicates those services are offered to sellers as a way to facilitate the sale").

Thus, where, as here, Amazon facilitates rather than drives the sale, it does not act as a "product seller" under the PLA.

### C. Amazon's Interactions with the Buyer Do Not Make it a "Product Seller"

As the case law appears largely to be silent on the issue, the Court will separately deal with whether the relationship between Amazon and the buyer, Ms. Wilmot, can serve as evidence that Amazon exerted sufficient control over the transaction to be a "product seller." Plaintiff argues that the fact that Amazon served as the sole point of contact for the seller demonstrates that its involvement in getting the product into the line of commerce was so all-encompassing that its actions must be covered by the PLA.

Plaintiff is correct that Amazon provided Ms. Wilmot the only link to the product: that is, Ms. Wilmot, believing that Amazon had "good deals," logged into her mother's Amazon Prime account, searched for the battery, and completed the purchase. Amazon charged Ms. Wilmot $12.29 for the battery and the transaction appeared on her credit card statement under Amazon's

name. Had Ms. Wilmot chosen to return the battery prior to the fire, she could only have done so through Amazon's customer service, through which she could generate an Amazon return shipping label, and mail the battery to the designated Amazon facility for a credit on her credit card. And after the fire, it was Amazon, not E-Life, to whom Ms. Wilmot turned for recourse and who provided her a refund in the form of a gift card.[7] However, whether these services may have caused Ms. Wilmot to *believe* Amazon was the seller is of no moment. Indeed, a dispute of fact exists as to whether Plaintiff reasonably believed that Amazon was the seller of the battery. As Defendants point out, the marketplace identifies the seller to the buyer throughout the product viewing and ordering process, including in the "sold by" line next to the price and shipping information on the product detail page and on the order confirmation page. This dispute is, however, immaterial to whether Amazon acted as a product seller under the PLA. Rather, crucially, Amazon never exerted control over the transaction, as explained *infra*, and, thus, is not a product seller.

While the consumer's subjective belief about the identity of the seller is not determinative, there may be instances where Amazon's interaction with the consumer might transform it into a "product seller." Here, there is no evidence in the record that Amazon exceeded the scope of the ABSA and FBA agreement, which set forth Amazon's responsibilities in interacting with the consumer, such as by providing customer service and handling product returns. It, thus, did not take any actions that might convert it into a "product seller." Had Amazon acted outside the scope of the agreements or taken affirmative steps to take control of

---

[7] Amazon disputes the scope of the remedy provided pursuant to its Guarantee but does not dispute that it allows Amazon users to return defective goods. In addition, Defendant, Amazon argues that its "Conditions of Use" disclaims all warranties, while Plaintiff claims that these conditions do not apply to the transaction at issue. These issues do not impact whether Amazon is a "product seller," and are, therefore, not material to this Court's analysis.

the product, including in its interactions with the consumer, then the "product seller" label might apply to its actions. But those are not the facts before the Court, and I need not speculate whether there might be a specific factual scenario that would subject Amazon to liability. On the facts before the Court, the relationship between Amazon and Ms. Wilmot does not make Amazon a "product seller."

### D. Public Policy Does Not Support Amazon's Status as a Product Seller

Both parties offer arguments about the apparently profound public policy consequences that this Court's decision regarding Amazon's status as a product seller would have. As New Jersey courts have explained, "[t]he overriding goal of strict products liability is to protect consumers and promote product safety," *Hughes v. A.W. Chesterton Co.*, 435 N.J. Super. 326, 342, 89 A.3d 179, 188 (App. Div. 2014) (citing *Fischer v. Johns–Manville Corp.*, 103 N.J. 643, 657 (1986)). Allowing parties to shift the risk of loss up the distribution chain is consistent with the principles of 1) allocating the risk of loss to the party better able to control the risk, and 2) to the party best able to distribute its costs. *Promaulayko*, 116 N.J. 505 at 510. In evaluating these public policy goals, courts should be cognizant that products liability law is, ultimately, "based on concepts of fairness, feasibility, practicality and functional responsibility." *Zaza*, 144 N.J. at 64.

Based on the undisputed facts here, Amazon lacks control over the product at issue, making it, ultimately, unable to manage the risks posed by the allegedly defective product. Neither party disputes that no contract exists between Amazon and the manufacturer; in fact, Amazon admits that it does not know the manufacturer's identity. Thus, lacking a "contractual relationship with the manufacturer or supplier," Amazon was not "in a position to exert pressure to ensure the safety of the product …." *Oscar Mayer*, 744 F. Supp. at 84. *See also Oberdorf*,

2017 WL 6527142, at *3 (noting that Amazon "cannot have any direct impact upon the manufacture of the products sold by the third-party vendors"). Amazon *is* contractually bound with Lenoge, but, as already explained, these agreements relate mainly to the relationship between the two parties, not to Amazon's control over Lenoge's product. What is more, the ABSA does not grant Amazon the discretion to raise prices; so, unlike a manufacturer or seller, Amazon would not be able to "recapture the expense of an occasional defective product by an increase in the cost of the product." *Oscar Mayer*, 744 F. Supp. at 84.[8]

The Court acknowledges Plaintiff's argument that, in this instance, Amazon is likely best positioned to distribute costs up the distribution chain. Generally, the absence of the original manufacturer or producer of a product does not deprive the injured party of a cause of action. *Promaulayko*, 116 N.J. at 510–11. Here, however, it is not clear that, without Amazon as a Defendant, Plaintiff would lack an appropriate party to sue. Indeed, neither party has identified the manufacturer of the battery, and it is unclear whether Lenoge, a Hong Kong company, is subject to service of process in the United States. It is, thus, an open question whether Plaintiff can bring suit against Lenoge or another responsible party. It is undisputed, however, that Amazon can shift risk further up the distribution chain to Lenoge, which is required under the ABSA to indemnify Amazon for any claims or losses arising from or related to the sale of its products. *See Santiago v. E.W. Bliss Div., Gulf & Western Mfg. Co.*, 201 N.J. Super. 205, 224 (App. Div. 1985) (recognizing that entities in the distribution chain can seek indemnity up the chain of distribution and spread the expense of a defective product by securing insurance against product defects).

---

[8]Although the Court recognizes that Amazon's size and market power may be relevant to its ability to control the risks posed by defective products, this reality is not sufficient to alter the Court's analysis, as "liability is not to be predicated on profit." *Lyons*, 170 N.J. Super. at 197.

Although allowing an injured Plaintiff to sue a party that can shift the risk up the distribution chain would support the consumer protection goals of strict products liability, the other policies animating the PLA and its amendments are stronger counterweights. The legislature enacted the statute as remedial legislation aimed at "limit[ing] the expansion of products-liability law." *Zaza*., 144 N.J. at 47 (citing *Roberts v. Rich Foods, Inc*., 139 N.J. 365, 374 (1995)). To do this, it included immunity provisions, which reflect the policy goal of "reduc[ing] litigation costs borne by innocent retailers in product liability actions." *Claypotch*, 360 N.J. Super. at 485. Further, Amazon contends that finding it to be a "product seller" would "*radically* expand seller liability." ECF No. 17-3 at 12 (emphasis added). But even were that not the case, I find that stretching the case law to capture Amazon's activities in this case would conflict with the spirit of the law. As the Supreme Court of New Jersey has explained, courts should be cautious in expanding the law when doing so "would impose a substantial economic burden on these businesses and individuals, without necessarily achieving the goal of enhanced product safety." *Zaza*, 144 N.J. at 65. "In developing steps towards higher consumer and user protection through higher trade morality and responsibility, the law should view trade relations realistically rather than mythically." *Id.* (quoting *Schipper v. Levitt and Sons, Inc*., 44 N.J. 70, 99 (1965)). Against the backdrop of this legislative intent and the weight of New Jersey authority, public policy arguments cannot transform Amazon into a "product seller" in this instance.[9]

---

[9] Amazon also argues that even if the Court were to find it to be a "product seller" under the PLA, Amazon would nonetheless be immune from liability through the Communications Decency Act, a federal statute that immunizes certain internet service providers for content posted by third parties. 47 U.S.C. § 230. The parties dispute "whether Plaintiff's claims seek to treat Defendant as a publisher or speaker of third party content" and immune from liability, or rather as a party directly involved in tortious conduct and not immune. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 564 F.Supp.2d 544, 548 (E.D. Va. 2008), *aff'd*, 591 F.3d 250 (4th Cir. 2009). The Court notes that there is a split of authority on whether the CDA immunizes Amazon's conduct in similar circumstances. *Compare*, *e.g.*, *McDonald*, 219 F. Supp at 538

## IV. __CONCLUSION__

For the foregoing reasons, I find that Amazon is not a "product seller" with respect to the sale of the battery to Ms. Wilmot. Defendant's Motion for Summary Judgment is granted in its entirety and Plaintiff's Motion for Partial Summary Judgment is, consequently, denied.

Dated: July 24, 2018                                        /s/ Freda L. Wolfson
                                                           Hon. Freda L. Wolfson
                                                           United States District Judge

---

(claims are not immunized by CDA because they did "not necessarily seek to hold Amazon liable as a 'publisher or speaker" because "the issue pivots around the battery itself, Amazon's involvement in the sale of same, and Amazon's guarantee regarding its condition, regardless of how the battery was posted on Amazon's website") *with Oberdorf*, 295 F.Supp.3d at 502 (CDA does immunize Amazon because claims were "attempting to hold Amazon liable for its role in publishing an advertisement for The Furry Group's product"). Because I find that Amazon is not a "product seller" under the PLA, I need not resolve this split and determine whether the CDA immunizes Defendant from Plaintiff's claims.